IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 1:22-cr-228-ECM-JTA |
| | ) | |
| MARENZO MARQUIS ROBERTS | ) | (WO) |

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This cause is before the court on Defendant Marenzo Marquis Roberts' Motion to Suppress.  (Doc. No. 27.)  Roberts challenges the seizure and search of a Priority Mail Express package, search of his vehicle, seizure of evidence from his vehicle, and search of two cell phones recovered from his vehicle.  After due consideration of the parties' arguments, witness testimony and applicable law, the undersigned concludes that the motion to suppress is due to be DENIED.

## I.    PROCEDURAL HISTORY

A federal grand jury returned a four-count indictment against Roberts on July 12, 2022.  (Doc. No. 1.)  The indictment charged Roberts with one count of possession of methamphetamine with intent to distribute in violation of 21 U.S.C. § 841(a)(1); two counts of use of a communication facility to cause or facilitate the commission of felonies under the Controlled Substances Act in violation of 21 U.S.C. § 843(b); and one count of possession of a controlled substance (to wit: methamphetamine, marijuana, cocaine hydrochloride, and hydrocodone) in violation of 21 U.S.C. § 844(a).  (*Id*.)  Roberts entered

a plea of not guilty to all counts during his arraignment on September 16, 2022.  (Doc. No. 11.)  This matter is set for trial for July 10, 2023.  (Doc. No. 57.)

On December 2, 2022, Roberts filed an untimely motion to suppress.[1]  (Doc. No. 27.)  The Government filed its response in opposition (Doc. No. 38), and Roberts filed his reply thereto (Doc. No. 40).  During the evidentiary hearing conducted on January 25, 2023, the Government asserted for the first time that Roberts lacked standing to challenge the search of the Priority Mail Express package.  (Doc. No. 53, Transcript of Evidentiary Hearing ("Tr.") at 11.)  The court directed the Government to file a supplemental brief on the issue.  (Doc. No. 47.)  The Government filed its supplemental brief (Doc. No. 49) and Roberts filed a response (Doc. No. 50).

This matter is ripe for disposition.

---

[1] Roberts sought permission to file the motion to suppress out of time (Doc. No. 26) and the court granted permission on December 29, 2022 (Doc. No. 35).

## II.    FINDINGS OF FACT[2]

During the evidentiary hearing, the court heard testimony from three witnesses: Louis Robert Boucher,[3] Jim Tynan,[4] and Brad Watson.[5]   The testimony and evidence adduced at the hearing establish the following facts.[6]

On March 11, 2021, a Priority Mail Express package arrived at the United States Postal Service ("USPS") Montgomery Processing and Distribution Center.   The package was mailed from California.   The package was flown by FedEx from California to Memphis, Tennessee and then to Birmingham, Alabama.   After the package arrived in Birmingham, it was transported by truck[7] to Montgomery.

---

[2] The undersigned reaches findings of fact at a suppression hearing based on a preponderance of the evidence. *United States v. Beechum*, 582 F.2d 898, 913 n.16 (5th Cir. 1978) (citation omitted).

[3] Boucher is the USPS Acting Transportation Manager at the Montgomery Processing and Distribution Center.   In March 2021, he was the Network Specialist who monitored the arrival of trucks.   He also formerly served as Supervisor of Transportation of Operations and as a letter carrier.   Boucher testified that he has knowledge and experience of how mail is processed at the Montgomery Processing and Distribution Center.

[4] Tynan is a Senior Special Agent with the Alabama Attorney General's Office. In March 2021, he was a postal inspector for the United States Postal Inspection Service ("USPIS").   As postal inspector, Tynan's primary duties included investigating crimes related to the mail system including mail theft, mail fraud, robberies, burglaries, and transportation of narcotics through the mail.

[5] Watson is a case agent with the State Bureau of Investigations ("SBI") of the Alabama Law Enforcement Agency and member of the United States Marshals Service Gulf Coast Regional Task Force.   He formerly served as a city police officer in Enterprise, Alabama, county deputy in Florida, and undercover agent for the SBI.

[6] The undersigned finds the testimony of the witnesses to be credible.

[7] USPS uses a contracting company to transport the mail by truck from Birmingham to Montgomery.

Jerry Delrie, an express mail clerk, was processing mail when he encountered the Priority Mail Express package.  Delrie noticed that the package appeared to have been reclosed and informed Boucher.  Boucher retrieved the package from Delrie.[8]  According to Boucher, the tape and Priority Mail Express label seal was broken on the package, and the package was "reclosed in a mover's closure" with a lip "folded over" another lip.[9] Boucher contacted Tynan and sent Tynan photographs of the package by text message. Boucher also weighed the package and noticed that the original weight of the package on the Priority Mail Express label was 5 pounds, 7.6 ounces; but the package now weighed only 5 pounds, 0.35 ounces.[10]  Boucher then sent the package to Tynan.

The following day, Tynan received the package and inspected it.  Tynan noticed the package had a high postage amount,[11] "was mailed from an individual with the surname of Comford . . . to an individual with the surname of Comford[,]"[12] and was mailed out of Pacoima, California.[13]  Tynan also noted the following: folded flaps of the package, which

---

[8] Delrie did not open the package.  (Doc. No. 53, Tr. at 51.)

[9] (Doc. No. 53, Tr. at 26.)

[10] Boucher did not open the package. (Doc. No. 53, Tr. at 55.)

[11] The package had $81.95 postage which, based on Tynan's experience, was "… very rare" for a package going to Headland, Alabama.  (Doc. No. 53, Tr. at 75.)

[12] According to Tynan a common tactic used by drug traffickers is selecting "surnames [that] are common" and he believed the surname Comford was an example of this tactic. (Doc. No. 53, Tr. at 8.)

[13] Tynan testified that "San Fernando and Pacoima are generally in the Los Angeles area. … [and] Los Angeles [is] a drug source location for drug parcels being mailed into the state of Alabama, particularly in the Middle District."  (Doc. No. 53, Tr. at 75.)

were "highly, highly unusual" "in the postal world[;]" uneven and inconsistent clear tape; that the Priority Mail Express sticker had been folded under; and a "cut or slice down the side of the box" indicating that it had been opened.[14]  Tynan unfolded the flaps to the package and found another box[15] which contained bubble wrap, a black paint can with an unsecured lid, a vacuum sealed bag with suspected methamphetamine,[16] and a dryer sheet.[17] Tynan then started an investigation to determine the identity of the individuals associated with the package. Tynan discovered that the package recipient's name was not associated with the recipient address listed on the package; the surname, "Comford," was not associated with the recipient's address written on the package; nor were the phone numbers written on the Priority Mail Express label associated with individuals with that surname.   Tynan requested assistance from the Alabama Law Enforcement Agency ("ALEA") and was informed that defendant Marenzo Roberts ("Roberts") was connected to the package recipient's address.[18]

---

[14] (Doc. No. 53, Tr. at 74-76.)

[15] The second, internal box was not taped close, had folded flaps, and the corner of the box was torn.  (Doc. No. 82-83.)

[16] Tynan field tested the suspected methamphetamine, and it tested positive.  (Doc. No. 53, Tr. 91.) The methamphetamine weighed a little less than three pounds.  (*Id*. at 183.)

[17] Tynan testified that a dryer sheet is commonly "used as a masking agent."  (Doc. No. 53, Tr. at 82.)

[18] At some point in the investigation, Tynan learned that a telephone number was tracking the package.  That telephone number was not the same number listed for the named recipient or the named sender on the Priority Mail Express label.  (Doc. No. 53, Tr. at 88-89.)

Tynan scanned the package for pick up at the post office on March 15, 2021.[19]   No one came to procure the package on that day.  However, on the following day, after being contacted by Tynan,[20] Roberts came to the post office and acquired the package.[21]  When Roberts returned to his vehicle with the package in hand,[22] ALEA approached in multiple vehicles with blue lights activated.  Roberts dropped the package on the ground by his vehicle and attempted to flee.  Tynan immediately secured the package.  Watson and other officers opened the unlocked doors to Roberts' vehicle to check for occupants[23] and no occupants were discovered.  Watson observed a clear plastic bag containing multiple types of drugs,[24] some mail, and some cell phones on the front passenger seat of Roberts' vehicle.

---

[19] Initially, Tynan and ALEA planned a controlled delivery of the package, but that plan was aborted when they realized the residence was adjacent to the Headland Middle School.  Instead, law enforcement decided to transport the package to the post office, scan it, and make it available for pick up. When no one attempted to obtain the package from the post office on March 15, law enforcement tried to deliver it to the residence, but no one was present.

[20] Earlier that morning, on March 16, 2021, Tynan was informed by a postal employee that an individual was at the Headland post office trying to pick up the package.  (Doc. No. 53, Tr. at 92.) The individual provided the "name of Marenzo Roberts and provided a phone number that happened to be the same phone number that was tracking the package."  (*Id*.) Tynan contacted ALEA and returned to the post office in Headland.  Tynan then called Roberts at the phone number provided and advised him that the package was available for pick up at the post office.

[21] Roberts provided his name, driver's license, and signature to Tynan to obtain the package.

[22] Roberts was driving a maroon sedan with tinted windows.

[23] Watson testified that law enforcement "cleared" Roberts' vehicle for "officer safety" and safety for the public.  (Doc. No. 53, Tr. at 235.)

[24] The clear plastic bag contained marijuana, Xanax, cocaine, and some pills.  (Doc. No. 53, Tr. at 191-192.)  Each drug was packaged separately within the clear bag.

Roberts was detained and law enforcement searched his vehicle.[25]   The drugs and three cell phones[26] were recovered from the vehicle.

Shortly thereafter, Tynan investigated the phone number used to track the package and obtained the IP history, subscriber data, and phone tolls for the number.  The phone records identified the cell phone as an iPhone, the subscriber data showed the phone number belonged to Roberts, and the call history contained the call between Tynan and Roberts.

A few weeks later, on April 8, 2021, Watson obtained a state search warrant for two of the phones found in Roberts' car: an Android and a black Apple iPhone.  Watson then provided the phones and state search warrant to Tynan.[27]  Tynan secured a forensic examiner from the Alabama Attorney General's office to execute the search warrant.  The forensic examiner extracted the data from the Android, but was unable to do so from the iPhone because he lacked the required technology.

---

[25] Watson testified that the vehicle was searched because Roberts "was under arrest for trafficking methamphetamine" and "he used the car in the commission of a crime."  (Doc. No. 53, Tr. at 218-219.)

[26] According to Watson there was an Android, iPhone, and one unidentified older phone.  (Doc. No. 53, Tr. at 192.)

[27] Watson testified that he provided the phones to Tynan so that "better equipment" could be used to "execute the search warrant on those phones."  (Doc. No. 53, Tr. at 208, 230.)  Likewise, Tynan testified that he took possession of the cell phones so that he could secure a forensic examiner with the Alabama Attorney General's Office to conduct the state search warrant.  (*Id.* at 98.)

On February 1, 2022,[28] Tynan obtained a federal search warrant for the iPhone. Tynan did so because he had experience with another forensic unit that had new technology with which it had successfully accessed iPhones. Once Tynan obtained the federal search warrant, the new forensic unit successfully extracted the data from the iPhone.[29]

## III.    DISCUSSION

### A.  Motion to Suppress

Roberts challenges every evidentiary aspect of his case.  He challenges the seizure and search of the package, the warrantless seizure and search of his car, the warrantless seizure of the contents of his car, and the state and federal search warrants for the cell phones.  (Doc. No. 27 at 6-7.)

The Government responds by arguing that Roberts does not have standing to challenge the seizure and search of the package, the officers lawfully seized and searched Roberts' vehicle, and the state and federal search warrants were lawful.  (Docs. No. 38, 49.)

The court addresses each argument in turn.

### B.  Governing Legal Principles

#### 1.  Fourth Amendment Protections

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S.

---

[28] Tynan waited 10 months before requesting a search warrant and he maintained possession of the cell phones at the USPIS office.

[29] At no point did Roberts contact law enforcement in an effort to retrieve his cell phones.

Const. amend. IV. "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). A "seizure" occurs when an individual's possessory interest in certain property is meaningfully interfered with. *Id.*

The Supreme Court has emphasized that the touchstone of the Fourth Amendment is reasonableness, "measured in objective terms by examining the totality of the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). A warrantless search or seizure is presumptively unreasonable, unless an exception to the warrant requirement applies. *United States v. Berrong*, 712 F.2d 1370, 1372 (11th Cir. 1983). This means a warrant generally must be obtained to search unless an exception applies. *Kentucky v. King*, 563 U.S. 452, 459 (2011).

"The Fourth Amendment requires that a search warrant be issued only when there is probable cause to believe that an offense has been committed and that evidence exists at the place for which the warrant is requested." *United States v. Betancourt*, 734 F.2d 750, 754 (11th Cir. 1984) (citing *Zurcher v. Stanford Daily*, 436 U.S. 547, 558 (1978)). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts"—and must be judged on the totality of the circumstances presented in each case. *Illinois v. Gates*, 462 U.S. 213, 232 (1983).

The burden of establishing that a search warrant is defective is upon the defendant. *United States v. Lockett*, 533 F. App'x 957 (11th Cir. 2013) (citation omitted) ("When a search is conducted pursuant to a warrant, the burden is on the defendant to show that the warrant is invalid.") "Under what is known as the 'exclusionary rule,' evidence seized as

a result of an illegal search may not be used by the government in a subsequent criminal prosecution." *United States v. Martin*, 297 F.3d 1308, 1312 (11th Cir. 2002). In *United States v. Leon,* 468 U.S. 897 (1984), the Supreme Court created a "good faith exception" to the exclusionary rule[30] where Fourth Amendment violations would otherwise prohibit the use of evidence seized during an unconstitutional search. 468 U.S. at 913. The exception applies where evidence is obtained "by officers reasonably relying on a warrant issued by a detached and neutral magistrate," that is subsequently invalidated for lack of probable cause. *Id*. "[The] good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization," and in conducting this inquiry, a court may consider "all of the circumstances." *Leon*, 468 U.S. at 922 n.23. The Government bears the burden of demonstrating the applicability of the good faith exception. *United States v. Robinson*, 336 F.3d 1293, 1297 (11th Cir. 2003) (citing *United States v. Travers*, 233 F.3d 1327, 1331 n.2 (11th Cir. 2000)).

---

[30] The exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights" by prohibiting the use of illegally seized evidence in criminal prosecutions. *United States v. Calandra*, 414 U.S. 338, 348 (1974). The rule is designed to deter misconduct by law enforcement by banning evidence obtained in violation of the Fourth Amendment. *United States v. Virden*, 488 F.3d 1317, 1322 (11th Cir. 2007) (citing *Nix v. Williams*, 467 U.S. 431, 442-43 (1984)). The rule "has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion." *Wong Sun v. United States*, 371 U.S. 471, 485 (1963).

2.   Fourth Amendment "Standing"[31]

The Supreme Court has regularly underscored that the Fourth Amendment "protects people, not places." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (quoting *Katz v. United States*, 389 U.S. 347, 351 (1967)).  Therefore, an individual "must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search." *Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018); *see Alderman v. United States*, 394 U.S. 165, 171–72 (1969) ("[S]uppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence.").  To have a cognizable Fourth Amendment interest, the person challenging a search "must have a reasonable expectation of privacy" in the object or area searched. *United States v. Cohen*, 38 F.4th 1364, 1368 (11th Cir. 2022) (citing *Minnesota*, 525 U.S. at 88); *Byrd*, 138 S. Ct. at 1526.  *See United States v. Gayden*, 977 F.3d 1146, 1151 (11th Cir. 2020) ("The application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action.") (citation omitted).  "By contrast,

---

[31]   The Eleventh Circuit has clarified that the "threshold issue of whether an individual has a reasonable expectation of privacy in the object of the challenged search" is known colloquially, but misleadingly, as "Fourth Amendment 'standing.'" *United States v. Ross*, 963 F.3d 1056, 1062 (11th Cir. 2020); *see also Byrd v. United States*, ___ U.S.___, 138 S. Ct. 1518, 1530 (2018) ("The concept of standing in Fourth Amendment cases can be a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search; but it should not be confused with Article III standing, which is jurisdictional and must be assessed before reaching the merits.").  The Eleventh Circuit has directed courts to "consider standing as part of the merits" when addressing Fourth Amendment claims.  *Presley v. United States*, 895 F.3d 1284, 1290 (11th Cir. 2018).

an individual's Fourth Amendment rights are *not* infringed—or even implicated—by a search of a thing or place in which he has no reasonable expectation of privacy." *United States v. Ross*, 964 F.3d 1034, 1040 (11th Cir. 2020) (citation omitted).

C. Analysis

    1. Seizure and Search of the Package

The Government argues that Roberts lacks standing to bring a Fourth Amendment claim for the package because he cannot show that he had a reasonable expectation of privacy in the package. (Doc. No. 49.) The Government contends that Roberts had no reasonable expectation of privacy in the package because he was neither the named sender nor the named recipient. The Government further contends that Roberts has established no connection to the named recipient.

Roberts responds that he has shown an expectation of privacy in the package because it was addressed to his home address, where he was living with his grandmother and as listed on his driver's license. (Doc. No. 50.) Roberts also contends that he tracked the delivery of the package using his cell phone and left his identifying information with postal employees when he inquired about the status of the delivery of the package. Roberts claims these actions show that he had "an actual, subjective expectation of possession and privacy in the package seized by the Postal Service." (*Id*. at 2.)

"[A] defendant [challenging a seizure or search] must establish both a subjective expectation of privacy in the place [seized or] searched as well as the objective reasonableness of that expectation." *United States v. Maxi*, 886 F.3d 1318, 1325 (11th Cir. 2018) (citing *Robinson*, 62 F.3d at 1328). *See also United States v. Campbell*, 434 F. App'x

12

805, 809 (11th Cir. 2011) (per curiam) ("In challenging a search under the Fourth Amendment, the defendant bears the burden of establishing 'both a subjective and an objective expectation of privacy' in the area or object searched.") (quoting *United States v. Segura-Baltazar*, 448 F.3d 1281, 1286 (11th Cir. 2006).  "The subjective component requires that a person exhibit an actual expectation of privacy, while the objective component requires that the privacy expectation be one that society is prepared to recognize as reasonable." *Id*.

"It is beyond dispute that mail is subject to Fourth Amendment protection." *United States v. Smith*, 39 F.3d 1143, 1144 (11th Cir. 1994) (citing *United States v. Jacobsen,* 466 U.S. 109, 114 (1984)).  Generally, "letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy." *Jacobsen*, 466 U.S. at 114.  "A defendant may have a reasonable expectation of privacy in a package even where the package is not addressed in the defendant's name, provided that he establishes a connection between himself and the addressee." *Campbell,* 434 F. App'x at 809 (quoting *United States v. Richards,* 638 F.2d 765, 767, 770 (5th Cir. 1981)).

Here, Roberts has not met his burden of demonstrating a reasonable expectation of privacy in the package.  Although Roberts presented evidence that he resided at the delivery address, "that evidence, standing alone, is insufficient to establish a reasonable expectation in *all* mail or packages sent to that address." *See United States v. Williams*, Case No.: 1:22-CR-8 (LAG), 2023 WL 2061164, *5 (M.D. Ga. Feb. 16, 2023) (citing *Campbell*, 434 F. App'x at 809).  In addition, Roberts was neither the named sender nor the named addressee on the package, and he has not even attempted to establish a connection between himself

and the persons listed on the package.  *See United States v. Richards,* 638 F.2d 765, 767, 770 (5th Cir. 1981)[32] (holding that a defendant who opened a post office box for "Mehling Arts & Crafts" had a reasonable expectation of privacy in a package addressed to Mehling"); *also Campbell*, 434 F. App'x at 809 (finding defendants had no standing to challenge the search of the package when they "were not the sender or named addressee on the package, [and] did [not] establish a connection to the named addressee or show that they used the name on the package as an alias"); *United States v. Robinson*, No. 19-14843, 2022 WL 278043, at *1 (11th Cir. Jan. 31, 2022) (per curiam) (affirming denial of motion to suppress where defendant "never alleged either of the names" listed on the package "was an alias of his," nor showed any other "connection to either of the addressees").  Further, Roberts has not presented any evidence that he was the sender of the package nor the intended recipient.  *Cf. United States v. Suarez*, Criminal Case No. 21-20290-CR-Scola, 2021 WL 3667011, *6 (S.D. Fla. 2021) (finding that the defendant had standing to bring the motion to suppress where his girlfriend identified him as the sender of the packages, he was the intended recipient even though the packages were mailed to a fictitious name, and he resided at the address where the packages were to be delivered).

Finally, the tracking of the package by Roberts on his cell phone and the disclosure of his identifying information to postal employees is insufficient to establish a reasonable expectation in the package.  Roberts has presented no evidence or case law which

---

[32] *See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (holding that decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981, are binding in the Eleventh Circuit).

establishes that tracking a package is sufficient to make a connection between himself and the package that satisfies Fourth Amendment standards.  Tynan testified that anyone who signs up for the USPS tracking service can track a package.  (Doc. No. 53, Tr. at 127.)  Hence, Roberts' mere utilization of the USPS tracking service is insufficient to establish a legitimate expectation of privacy in the package.  This same conclusion applies to Roberts' disclosure of his identifying information to postal employees.  Accordingly, Roberts has failed to present evidence which sufficiently establishes that he had a reasonable expectation of privacy in the package. Because Roberts failed to establish a reasonable expectation of privacy in the package before he challenged its search and seizure as unreasonable under the Fourth Amendment, his challenge must fail.[33]

The motion to suppress is due to be denied on this issue.

2.  Seizure and Search of Roberts' Car

Roberts contends the warrantless seizure and search of his car and its contents violated his Fourth Amendment rights.  (Doc. No. 27 at 9.) He argues no probable cause existed to search his car or seize its contents, and that no exigent circumstances existed that would justify such a search.  The Government responds that the warrantless search of Roberts' car was lawful under the automobile exception because law enforcement observed in plain view multiple narcotics on the front passenger seat of Roberts' vehicle while

---

[33] Because the undersigned finds that Roberts does not have standing to challenge the search of the package, the undersigned need not address whether the search violated the Fourth Amendment nor any arguments regarding the "fruits" of the illegal search of the package.

officers were clearing the vehicle for officer safety.[34]   (Doc. No. 38 at 15-16.)   The

Government also argues that the search of the vehicle was proper as a search incident to

Roberts' arrest.[35]   (*Id.* at 16-17.)

"Two possible exceptions [to the warrant requirement] could apply here—the

automobile exception and the search incident to arrest."  *United States v. Carter*, 481 F.

App'x 475, 477 (11th Cir. 2012).

> Under the automobile exception, police officers may conduct a warrantless
> search of a vehicle if the vehicle is readily mobile and if they have probable
> cause to believe that the vehicle contains contraband.   *Pennsylvania v.
> Labron,* 518 U.S. 938, 940, 116 S. Ct. 2485, 2487, 135 L. Ed. 2d 1031 (1996)
> (per curiam); *United States v. Watts,* 329 F.3d 1282, 1286 (11th Cir. 2003)
> (per curiam).   Accordingly, under the automobile exception, a vehicle search
> does not violate the Fourth Amendment if, "under the totality of the
> circumstances, there is a fair probability that contraband or evidence of a
> crime will be found in the vehicle."   [*United States v.*] *Tamari,* 454 F.3d
> [1259] at 1261–62 [(11th Cir. 2006)] (internal quotation marks omitted).
> Under the search incident to arrest exception, the Supreme Court recently
> clarified that the "[p]olice may search a vehicle incident to a recent
> occupant's arrest only if the arrestee is within reaching distance of the
> passenger compartment at the time of the search or it is reasonable to believe
> the vehicle contains evidence of the offense of arrest."   *Arizona v. Gant,* 556
> U.S. 332, 351, 129 S. Ct. 1710, 1723, 173 L. Ed. 2d 485 (2009).

*Id.*

---

[34] Initially, the Government argued in its brief that law enforcement observed in plain view the
clear plastic bag containing multiple narcotics sitting in the front passenger seat, "through the
passenger window of the car."  (Doc. No. 38 at 15.)  However, during the evidentiary hearing, the
Government changed course and argued that the officers observed in plain view the clear plastic
bag of narcotics while they were completing a "protective sweep" of Roberts' vehicle.  (Doc. No.
53, Tr. at 250-251.)  Neither party provided authority to the court on this issue.

[35] The Government argued for the first time at the evidentiary hearing that the search of Roberts'
vehicle was justified under the inventory search exception.  (Doc. No. 53, Tr. at 252.)  The
Government provided no authority for its argument and did not file any supplemental briefing.

Under the plain view doctrine, an object may be seized without a warrant if (1) an officer is lawfully located in a place from which the object can be plainly viewed, (2) the officer has a lawful right to access the object, and (3) the object's incriminating nature is immediately apparent.  *United States v. Folk*, 754 F.3d 905, 911 (11th Cir. 2014).  *See United States v. Susini*, 261 F. App'x 270, 273 (11th Cir. 2008) ("[I]t is well-settled that 'objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced into evidence.'") (quoting *Harris v. United States*, 88 S. Ct. 992, 993 (1968)); *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) ("[I]f contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth Amendment—or at least no search independent of the initial intrusion that gave the officers their vantage point.").  For the incriminating character of an item to be "immediately apparent," police must have probable cause to believe the object in plain view is contraband or evidence of a crime.  *Dickerson*, 508 U.S. at 374-75.  "[A] police officer may draw inferences based on his own training and experience in deciding whether probable cause exists . . . ."  *United States v. Reeves*, 604 F. App'x 823, 827 (11th Cir. 2015).

First, considering the totality of the circumstances, the undersigned finds that the clear bag of multiple narcotics was discovered by law enforcement in plain view.  There is no dispute that law enforcement was lawfully located outside of Roberts' vehicle after he exited the post office, he approached his vehicle, and he fled.  However, there is a dispute as to whether the officers were lawfully located in a place where the narcotics could be

seen when they opened the door to Roberts' vehicle to sweep it for occupants. The undersigned addresses this dispute now.

The Supreme Court has held that "incident to [an] arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Maryland v. Buie*, 494 U.S. 325, 334, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990). Watson testified that the officers "cleared" Roberts' vehicle, after Roberts fled on foot, to ensure "there was nobody in there with a gun; that there wasn't five people in the car that we had to deal with." (Doc. No. 53, Tr. at 187-188.) Watson also testified that his "biggest concern was [Roberts'] vehicle because – just because there doesn't look like there's anybody in it doesn't mean that there's not." (*Id*. at 187.) Based on the evidence in the record, the undersigned finds that the protective sweep of Roberts' vehicle for occupants was proper for officer safety. Because the vehicle had tinted windows which were "pretty dark"[36] and "a person could have been hiding inside waiting to launch an attack" against law enforcement, the sweep of Roberts' vehicle was reasonably necessary for officer safety. *Walker v. Gov't of Virgin Islands*, 303 F. Supp. 2d 579, 582 (D.V.I. 2004) (finding sweep of vehicle lawful). *See United States v. Thomas*, 249 F.3d 725, 729-730 (8th Cir. 2001) (finding protective sweep of vehicle was reasonably necessary because "[i]n order to protect their safety . . ., the officers needed to ensure that others would not

---

[36] (Doc. No. 53, Tr. at 190). Watson testified "if there would have been somebody in the vehicle, which we did not know at that time, they could have seen us but we couldn't have seen them." (*Id*. at 191.)

be emerging from the [vehicle]" and "the officers could not see inside the [vehicle] from the outside, making it necessary to enter the [vehicle] to determine if it contained additional occupants").[37]   Therefore, having lawfully opened the doors to Roberts' vehicle to search for occupants, the undersigned finds that the officers were lawfully located in a place where the narcotics could be seen when they observed the narcotics on the front passenger seat.

The undersigned further finds that the other criteria under the plain view doctrine are satisfied.  Because of Watson's training and experience with narcotics,[38] he was able to identify the items in the clear plastic bag as suspected narcotics[39] and had the lawful right to access it.  Also, because of Watson's training and experience, the incriminating nature of the bag was immediately apparent.

Second, the undersigned finds that the search was valid under the automobile search exception to the warrant requirement and did not violate the Fourth Amendment.  The evidence of record establishes that Roberts' vehicle was operational at the time of his arrest because he drove the vehicle to the Headland Post Office and parked it in the parking lot. (Doc. No. 53, Tr. at 185.)  *See United States v. Russell*, No. 21-14081, 2023 WL 2062592, at *6 (11th Cir. Feb. 17, 2023) ("The first prong [of the automobile exception] is satisfied if the car is operational.") (citing *United States v. Lindsey*, 482 F.3d 1285, 1293 (11th Cir.

---

[37] The undersigned is persuaded by the authority cited herein.

[38] Watson testified that he has received training on narcotics and worked as an undercover police officer for most of his career purchasing narcotics across the State of Alabama.  (Doc. No. 53, Tr. at 173-74.)

[39] Watson testified that he identified some of the narcotics as marijuana, cocaine and Xanax.  (Doc. No. 53, Tr. at 191-92.)

2007)).   Moreover, law enforcement had probable cause to seize and search the vehicle because Watson and other officers observed in plain view a large clear plastic bag containing multiple narcotics sitting in the front passenger seat.  (Doc. No. 53, Tr. at 191.) Hence, probable cause existed to believe that Roberts' vehicle contained evidence of his drug trafficking activities.  The automobile exception to the warrant requirement thus applies here.[40]  Accordingly, the seizure and search of Roberts' car did not violate the Fourth Amendment.

The motion to suppress is due to be denied on this issue.

3.  Lack of Probable Cause in Search Warrants for Content of Cell Phones

Roberts contends the state search warrant was not supported by probable cause. (Doc. No. 27 at 15-16.)  He argues the application for the search warrant makes no mention of cell phones or their association to the investigation, other than the hand-written last sentence at the bottom of the application.  Roberts asserts that the warrant affidavit "does not mention any use of cellphones, does not describe particular cellphones, does not identify where or how cellphones were observed and located, and does not even make a general assertion about criminal use of cellphones."  (Doc. No. 40 at 5.)  Roberts thus argues that the state warrant application "did not state any probable cause to find evidence of a crime on any of the cellphones [sic]."  (Doc. No. 27 at 17.)

---

[40] The undersigned need not address the Government's arguments relating to a search incident to arrest or the inventory search exception because the search of Roberts' vehicle was proper under the automobile exception.

In addition, Roberts contends the federal search warrant was lacking in probable cause. [41] (Doc. No. 40 at 7.)  Roberts asserts the "only basis for searching the cellphones [sic] is [Tynan's] allegation of his general belief that there will be evidence 'related to the [drug] conspiracy' on the cellphone."  (*Id*.)  Roberts declares that "doubts" should have been "raised" "about the 'probable cause' asserted" in the warrant affidavit because it erroneously asserted that the iPhone was not in the custody of law enforcement and that execution of the warrant would be "supported by a search warrant for the residence and curtilage of the cell phone owner."  (*Id*. at 7-8.)

The Government responds that the state search warrant affidavit as a whole provided a substantial basis for the issuing judge to conclude that probable cause existed to support the warrant.  (Doc. No. 38 at 18.)  As to the lack of probable cause in the federal search warrant, the Government did not file a supplemental brief addressing Robert's argument, but during the evidentiary hearing it argued "[t]here are a number of paragraphs in this affidavit that demonstrate why there was probable cause to search this cell phone" and "there was a fair probability that there would be evidence of a crime on that cell phone." (Doc. No. 53, Tr. at 256, 257.)

When reviewing an affidavit in support of a search warrant, the Supreme Court has stated that a magistrate should look to the totality of the circumstances, and that his task

---

[41] Notably, Roberts did not raise this argument in his motion to suppress as he did not receive a copy of the federal search warrant application until after filing his motion wherein he alerted the Government that the application remained under seal.  (Doc. No. 27 at 6.)  After obtaining the federal search warrant application, Roberts raised the issue in his reply brief (Doc. No. 40 at 7-8), and during the evidentiary hearing (Doc. No. 53, Tr. at 238).

is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.  And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed.

*Gates*, 462 U.S. at 238-39; *see also United States v. Karpordelis*, 569 F.3d 1291, 1310

(11th Cir. 2009).  The Eleventh Circuit has explained:

When called upon by law enforcement officials to determine the legitimacy of search warrants and their supporting affidavits, issuing magistrates and reviewing courts alike must strike a delicate balance between constitutional guarantees against excessive intrusions into areas of individual freedom and the Government's need to access and to secure relevant evidence in criminal prosecutions.  In particular, issuing magistrates are given the unenviable task of making "firing line" decisions that attempt to encourage availment of the warrant process while simultaneously striving to protect citizens from unwarranted governmental interference.  In recognition of the difficulty inherent in discharging this responsibility, reviewing courts lend substantial deference to an issuing magistrate's probable cause determinations.

*United States v. Miller*, 24 F.3d 1357, 1363 (11th Cir. 1994).  "Courts reviewing the

legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical

manner."  *Id*. at 1361 (citation omitted).  Instead, "a realistic and commonsense approach

should be employed so as to encourage recourse to the warrant process and to promote the

high level of deference traditionally given to magistrates in their probable cause

determinations."  *Id*. (citation omitted).  Therefore, a reviewing court does not conduct a

"de novo probable-cause determination[,]" but rather "merely decide[s] whether the

evidence viewed as a whole provided a 'substantial basis' for the [issuing judge's] finding

of probable cause."  *Massachusetts v. Upton*, 466 U.S. 727, 732-33 (1984) (per curiam).

"It is critical to a showing of probable cause that the affidavit state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002) (quoting *United States v. Hove*, 848 F.2d 137, 140 (9th Cir. 1988) (citation omitted)).

As aforementioned, the burden of establishing that a search warrant is defective is upon the defendant. *United States v. Lockett*, 533 F. App'x 957, 965 (11th Cir. 2013) (citation omitted) ("When a search is conducted pursuant to a warrant, the burden is on the defendant to show that the warrant is invalid."); *see also Franks v. Delaware*, 438 U.S. 154, 171 (1978). "Affidavits supporting warrants are presumptively valid." *United States v. Lebowitz*, 676 F.3d 1000, 1010 (11th Cir. 2012).

The court's consideration of a defendant's facial challenge to a search warrant is confined to the "four corners" of the search warrant affidavit. *See United States v. Schulz*, 486 F. App'x 838, 841 (11th Cir. 2012) (citation omitted); *United States v. Lockett*, 674 F.2d 843, 845 (11th Cir. 1982) (citations omitted) ("In passing on the validity of the warrant, consideration may be given only to information brought to the attention of the magistrate.").

Here, the state warrant affidavit asserts that probable cause exists "to believe that . . . Marenzo Roberts has digital information on his Black iPhone and Android L51 Cell Phone that contains the illegal sales, use, manufacturing, and purchase of controlled substances including marijuana and methamphetamine." (Doc. No. 48-3 at 2.) The affidavit states that the USPS intercepted a package shipped from California to 131 East Railroad Street in Headland, Alabama on March 12, 2021, and that the package contained

23

almost three pounds of methamphetamine.  The affidavit also states that a Black male was requesting the package at the post office on March 17, 2021 and was advised that it would be available for pick up that afternoon.  The affidavit further states that a Black male picked up the package from the post office.  The affidavit states that after exiting the post office, the Black male encountered police, dropped the package beside his vehicle, and attempted to flee on foot.  The affidavit provides that the Black male was apprehended by the officers a few feet away from his vehicle.  The affidavit also provides that the officers cleared the suspect's vehicle for any occupants and identified the suspect as Roberts.  The affidavit states that an officer observed in the vehicle a large clear plastic bag on the front passenger seat containing multiple types of narcotics and, handwritten at the bottom, the affidavit states that the cell phones referenced in the affidavit were found in the suspect's vehicle.

Viewing the facts known to the state court judge issuing the search warrant as a whole, the undersigned cannot conclude that the warrant affidavit lacked a substantial basis for finding probable cause.  The Supreme Court has recognized that "it takes no special expertise for a judge to infer that information related to an active criminal enterprise may be contained on a cell phone."  *United States v. Kendricks*, CRIMINAL ACTION FILE NO. 1:15-CR-400-MHC-AJB, 2016 WL 5952743, at *7 (N.D. Ga. Oct. 13, 2016), *aff'd*, 723 F. App'x 950 (11th Cir. 2018) (per curiam) (unpublished) (citing *Riley v. California*, 573 U.S. 373, 401 (2014)).  "Cell phones have become important tools in facilitating coordination and communication among members of criminal enterprises, and can provide valuable incriminating information about dangerous criminals."  *Riley*, 573 U.S. at 401. The Eleventh Circuit and numerous other federal appellate courts recognize that cell

phones are "a known tool of the drug trade." *United States v. Nixon*, 918 F.2d 895, 900 (11th Cir. 1990); *see also United States v. Lazcano–Villalobos*, 175 F.3d 838, 844 (10th Cir. 1999) ("[C]ellular telephones are recognized tools of the drug-dealing trade."); *United States v. Sasson*, 62 F.3d 874, 886 (7th Cir. 1995) (describing possession of cell phones, among several other objects, as one of "the usual 'trappings' of a person involved in the drug trade"); *United States v. De La Cruz*, 996 F.2d 1307, 1311 (1st Cir. 1993) (labeling cell phones and beepers as "well known tools of the drug trade"). Here, there was a fair probability that evidence of drug trafficking would be found in Roberts' cell phones because, as stated in the search warrant, the cell phones were discovered in Roberts' vehicle, which he drove to pick up a package containing methamphetamine, and in which law enforcement also discovered other narcotics. Law enforcement thus had probable cause to search the cell phones in an effort to locate information relating to Roberts' drug trafficking activities. *See Clark v. United States*, No. 20-10526-A, 2020 WL 4668918, at *2 (11th Cir. July 31, 2020) (finding "law enforcement officers had probable cause to obtain a warrant to search the cell phone because it was found in a truck with two kilograms of heroin and $24,000 of loose currency during the investigation into the heroin-distribution conspiracy"). Consequently, the facts in the affidavit provided a sufficient basis for finding probable cause.

Furthermore, even if the search warrant affidavit lacked probable cause, the good faith exception applies. The *Leon* "good-faith" exception does not apply where the warrant is so lacking in indicia of probable cause that official belief in its validity is entirely unreasonable. *Leon*, 468 U.S. at 923. The good-faith exception requires suppression of

the evidence only if the law enforcement officers executing the warrant in question "were dishonest or reckless in preparing their affidavit, or could not have harbored an objectively reasonable belief in the existence of probable cause." *Martin*, 297 F.3d at 1313.  Here, the search warrant was not so lacking in indicia of probable cause that official belief in its validity was entirely unreasonable.  Nor is there evidence in the record showing that Watson acted dishonestly in preparing the affidavit.[42]  Hence, the undersigned concludes that the "good-faith" exception applies.

As to the federal search warrant, the affidavit states in relevant part, as follows:

- [The] affidavit [is made] in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device— which is currently in the possession of the U.S. Postal Inspection Service (USPIS) . . . and the extraction from that property of

---

[42] There are four situations in which the *Leon* good-faith exception does not apply, and suppression is warranted:

(1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role in the manner condemned in *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319 (1979); (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.

*United States v. Martin*, 297 F.3d 1308, 1313 (11th Cir. 2002) (citation and internal marks omitted).  None of the circumstances precluding the good faith exception applies here as there is no evidence that false information was included in the affidavit, and there is nothing in the record that even hints that the state judge who reviewed the affidavit and signed the search warrant engaged in any misconduct or abrogation of judicial responsibility.  Finally, and as already discussed, the affidavit set forth sufficient probable cause, and in any event is not "so lacking ... as to render official belief in its existence entirely unreasonable." *Martin*, 297 F.3d at 1313 (citation and internal marks omitted).

electronically stored information . . . [relating to fraudulent activities . . . related to the receipt, mailing, possession, distribution or sale of illegal drugs, or conspiracy; . . . related to the laundering of money to support the drug trafficking conspiracy; . . . that relate to drug receipt/distribution, bribery, or conspiracy to commit bribery; . . . showing the transmission, or receipt of funds for the purpose of facilitating or carrying on unlawful drug distribution; . . . describing U.S. Postal Service packages, tracking numbers, or identifying information about packages, addresses or addressee names.

- The property to be searched is a black Apple iPhone cell phone . . . hereinafter the "Device." The Device is currently in the possession of USPIS . . . .

- The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data . . . .

- On March 11, 2021, [Tynan] obtained Express Mail package EJ 503 231 364 US, which arrived at the Montgomery Processing & Distribution Center and appeared to [him] to have been opened and re-closed. On March 12, 2021, [he and] Inspector C. L. Phillips . . . examined the package, which had clearly been cut open and the flaps folded closed. Inspectors found an interior box that had also been opened and contained a black plastic paint can and a vacuum sealed bag of suspected methamphetamine. The weight of the methamphetamine was about 2 lbs. 14.2 oz. A USPIS forensic lab examination later determined that the controlled substance was approximately 1287 grams of methamphetamine, with a purity of 96%.

- On March 15, 2021, [Tynan] learned the package was being tracked online with the Postal Service. A search of Postal Service records showed that phone number (334) 579-7070 signed up to receive SMS alerts on the delivery status of the package. Research conducted by ALEA, whom [Tynan] had contacted for assistance, led to a suspect named Marenzo Roberts. Roberts possesses an Alabama Driver's License . . . that lists his home address as the same address on the package . . . . in Headland, AL 36345.

- On March 15, 2021, law enforcement planned a controlled delivery of the package. . . . [Tynan] had the package scanned available to be picked up at the post office; no one attempted to pick up the package. . . .

- On March 16, 2021, [Tynan] was contacted by the Supervisor of Customer Services at the Headland Post Office, who reported that at about 10:30 a.m., a black male wearing black clothing showed up and

27

attempted to pick up the package; the man provided the following name and phone number: Marenzo Roberts, (334) 579-7070. This is the same phone number that was getting SMS alerts from the Postal Service.

- On March 16, 2021, . . . at 1:56 p.m. [Tynan] called telephone number (334) 579-7070 and told Mr. Roberts his package was available to be picked up at the post office; he stated okay and thanked [Tynan] for calling. At about 2:07 p.m., Roberts entered the Headland post office and provided the clerk with his driver's license. [Tynan] documented Roberts' drivers' license. At [Tynan's] direction, and witnessed by [Tynan], the package was delivered to Roberts who signed an illegible name at the counter and on PS Form 3849. Upon exiting the post office, while getting into his vehicle, Roberts was confronted by law enforcement. Roberts dropped the package near his car and ran from the police. Roberts was taken into custody.

- [Tynan] recovered the package and ALEA recovered other narcotics and cell phones located in Roberts' car. The narcotics located in Roberts' car were submitted to the USPIS forensic lab. The lab identified the narcotics as marijuana, Etizolam, promethazine, methamphetamine tablets, hydrocodone and acetaminophen, sildenafil, and cocaine.
  . . .

- On March 24, 2021, [Tynan] subpoenaed AT&T for records related to phone number (334) 579-7070. A review of the subscriber and call detail records for phone number (334) 579-7070 showed the user as Marenzo Roberts. Also, a review of the call detail records showed where [Tynan] called Roberts to let him know his package was available to be picked up.
  . . .

- . . . A review of the call detail records provided by AT&T that related to (334) 579-7070 showed Roberts' phone used at this time was an iPhone 8 Plus.

- [Tynan] believe[s] Marenzo Roberts and his use of communication facilities, i.e., U.S. Mail and wireless telephones, are an integral part of this conspiracy. Based on [Tynan's] training and experience, [Tynan] believe[s] there is probable cause to search the contents of the Device for evidence, such as communications, phone calls, messages, pictures, emails, social media, encrypted messaging apps, and payment records among other things related to the conspiracy.

- The Device is currently in the lawful possession of USPIS. It came into USPIS's possession in the following way: the Device was seized

incident to Roberts's arrest on March 16, 2021 and turned over to USPIS to execute a state search warrant for the Device. Therefore, while USPIS might already have all necessary authority to examine the Device, [Tynan] seek[s] this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

- The Device is currently in storage at 135 Catoma Street, Montgomery, AL 36104. In [his] training and experience, [Tynan] know[s] that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the USPIS.

(Doc. No. 48-10.)  The warrant affidavit also detailed the training and experience of Tynan in regard to narcotics.  (*Id*.)  Further, the warrant affidavit defined the technical terms used therein and provided that in "[Tynan's] training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possess[ed] or used the device."  (*Id*.)

Viewing the facts known as a whole to the federal magistrate judge issuing the search warrant, the undersigned finds that the affidavit attached to the search warrant provided a substantial basis for finding probable cause to search Roberts' iPhone.  The facts in the affidavit as stated above indicated a fair probability that evidence of drug trafficking would be found in Roberts' iPhone, especially considering that the iPhone was used by Roberts to track the package containing methamphetamine, was provided by Roberts to the post office staff to coordinate pick up of the package, and was found in Roberts' vehicle with other narcotics when he came to pick up the package.  *See United States v. Gibson*, 708 F.3d 1256, 1278 (11th Cir. 2013) ("To obtain a warrant, police must establish probable cause to conclude that there is a fair probability that contraband or

evidence will be found in a particular place.") (quotation marks omitted); *also Clark*, 2020 WL 4668918, at *2.  Accordingly, the facts in the federal warrant affidavit provided the federal magistrate judge ample basis for finding probable cause.[43]

The motion to suppress is due to be denied on this issue.[44]

### 4.   Delay in Obtaining Federal and State Search Warrants for Cell Phones

Roberts argues the delay in obtaining the state and federal search warrants for the cell phones was unreasonable and violated the Fourth Amendment.  (Doc. No. 27 at 18.) He contends the "23-day delay for the state search warrant and the 321-day delay for the federal search warrant[ ] cannot be justified" by any "investigatory reasons for the delays, [any] diversion of law enforcement resources, [or] [any] complexity in the investigation or the contents of the warrant applications."  (*Id*. at 20.)  Roberts thus seeks suppression of the evidence contained in the cell phones.  (*Id*.)

---

[43] Alternatively, even if the federal search warrant had lacked probable cause, the undersigned finds the *Leon* good faith exception applies.  None of the circumstances precluding the good faith exception applies here.  For the reasons set forth above, the search warrant was not so lacking in indicia of probable cause that official belief in its validity was entirely unreasonable. *Leon*, 468 U.S. at 923.  Additionally, there is no evidence in the record showing that Tynan acted dishonestly in preparing the affidavit. *Martin*, 297 F.3d at 313.  Further, no evidence of record suggests that the federal magistrate judge who reviewed the affidavit and signed the search warrant engaged in any misconduct or abrogation of judicial responsibility.  Finally, the warrant is not facially deficient.  *Id*.

[44] In regard to the inconsistencies, inaccuracies or misstatements located in the state and federal search warrants which Roberts brings to the court's attention, the undersigned finds that the statements are understandable misstatements that are not essential to the finding of probable cause. *See generally United States v. Glinton*, 154 F.3d 1245, 1256 (11th Cir. 1998) ("As has often been stated, minor discrepancies in an affidavit should not subvert an officer's good-faith revelations of facts establishing probable cause." (citing *Illinois v. Rodriguez*, 497 U.S. 177, 184-85 (1990); *Maryland v. Garrison*, 480 U.S. 79, 88 (1987) ("Warrant still valid if inaccuracies in affidavit are 'objectively understandable and reasonable.'")).

The Government responds that any delay in obtaining the warrants was reasonable. (Doc. No. 38 at 23.)  The Government contends the law enforcement officers worked diligently to investigate the case during the passage of time in obtaining the state search warrant and the federal warrant.  (*Id*. at 23-24.)  The Government also contends Roberts has not presented any evidence establishing he requested return of the cell phones. (*Id*. at 24.)

"[A] seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable searches.' "  *United States v. Mitchell*, 565 F.3d 1347, 1350 (11th Cir. 2009) (quoting *United States v. Jacobsen*, 466 U.S. 109, 124 (1984)).  "Thus, even a seizure based on probable cause is unconstitutional if the police act with unreasonable delay in securing a warrant."  (*Id*.) (internal quotations and citations omitted).  "The reasonableness of the delay is determined 'in light of all the facts and circumstances,' and 'on a case-by-case basis.'"  (*Id*. at 351) (quoting *United States v. Mayomi*, 873 F.2d 1049, 1054 n. 6 (7th Cir. 1989)).  "[T]he reasonableness determination will reflect a 'careful balancing of governmental and private interests.' "  (*Id*.) (quoting *Soldal v. Cook County*, 506 U.S. 56, 71 (1992); *see also United States v. Prevo*, 435 F.3d 1343, 1345 (11th Cir. 2006)).

The Government presented Watson's testimony explaining that the delay in obtaining a state search warrant 23 days after seizure of Roberts' cell phones was the result of Watson working ten drug investigations during that same period and his absence from work due to an illness.  (Doc. No. 53, Tr. at 204-206.)  According to Watson, "[t]he first

day back at work after being out sick for those last three days is when [he] obtained the cell phone warrants."  (*Id*. at 206.)

"A temporary warrantless seizure supported by probable cause is reasonable as long as 'the police diligently obtained a warrant in a reasonable period of time.'"  *United States v. Laist*, 702 F.3d 608, 613 (11th Cir. 2012) (quoting *Illinois v. McArthur*, 531 U.S. 326, 334 (2001)).  "In evaluating these often difficult cases, 'rather than employing a *per se* rule of unreasonableness,' the Supreme Court has held that a court must 'balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable.'"  *Id.* at 613 (citations omitted).

> In the past, courts have identified several factors highly relevant to this inquiry: first, the significance of the interference with the person's possessory interest, *see Mitchell*, 565 F.3d at 1351; second, the duration of the delay, *see [United States v.] Place*, 462 U.S. [696,] 709, 103 S. Ct. 2637 [(1983)](characterizing the "brevity" of the seizure as "an important factor"); third, whether or not the person consented to the seizure, *see United States v. Stabile*, 633 F.3d 219, 235 (3d Cir. 2011); and fourth, the government's legitimate interest in holding the property as evidence, *see [United States v.] Burgard*, 675 F.3d [1029,] 1033 [(7th Cir. 2012) . . . .
>
> When balancing these interests to determine the reasonableness of the government's actions, we are also obliged to "take into account whether the police diligently pursue[d] their investigation."  *Place*, 462 U.S. at 709, 103 S. Ct. 2637.  Thus, among other factors, we consider the nature and complexity of the investigation and whether "overriding circumstances arose, necessitating the diversion of law enforcement personnel to another case," *see Mitchell*, 565 F.3d at 1353; the quality of the warrant application and the amount of time we expect such a warrant would take to prepare, *see id*. at 1351; and any other evidence proving or disproving law enforcement's diligence in obtaining the warrant.  These factors are by no means exhaustive, but they are the most relevant when we seek to "balance the privacy-related and law enforcement-related concerns," *McArthur*, 531 U.S. at 331, 121 S. Ct. 946, at stake in cases of this kind.  Given the complex interactions of these factors, this balancing calculus is fact-intensive and it is therefore unwise to establish a duration beyond which a seizure is definitively

unreasonable or, as discussed below, even presumptively unreasonable. Thus, in some contexts, a delay as short as 90 minutes may be unreasonable, *see Place*, 462 U.S. at 710, 103 S. Ct. 2637 (stop based on reasonable suspicion only); while in others, a delay of over three months may be reasonable.   *See Stabile*, 633 F.3d at 235–36 (computer seized with defendant's consent, which he did not revoke until after the warrant was obtained).

*Laist*, 702 F.3d at 613–14.[45]

The undersigned starts the balancing by considering the privacy-related concerns of Roberts.  As the Supreme Court made clear in *Riley v. California*, 573 U.S. 373 (2014), seizing Roberts' smart phones raises powerful Fourth Amendment concerns, both in the quality and quantity of private personal data they likely contain and because lengthy seizure of items of such vital importance in daily life is likely to significantly interfere with a person's possessory interest.  *Riley*, 573 U.S. at 403 ("Modern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans 'the privacies of life' . . .").  In addition, Roberts did not consent to the seizure of the cell phones.  However, such powerful Fourth Amendment concerns can be diminished, where as here, there is no evidence that Roberts made a request or demand for the return of his phones.  *See United States v. Johns*, 469 U.S. 478, 487 (1985) (noting defendants who "never sought return of the property . . . have not even alleged, much less proved, that the delay in the search . . . adversely affected legitimate interests protected by the Fourth Amendment").

---

[45] In *Laist*, the Eleventh Circuit held that a 25-day delay in obtaining a search warrant for a computer was not unreasonable.  *Id*. at 617.

By contrast, law enforcement had a strong legitimate interest in seizing and searching the phones because the officers had probable cause to believe Roberts was engaged in trafficking methamphetamine and other drugs.  The phones were found in Roberts' vehicle where other multiple narcotics were discovered, after Roberts had picked up a package containing methamphetamine, and after Roberts had received a call from Tynan on one of the phones regarding the status of the package.  There is no testimony regarding the complexity of the warrant application or complexity of the investigation by Watson, but the text of the warrant application itself establishes that it was not complex or time-consuming.  In addition, there is no evidence in the record showing that Watson delayed obtaining the state search warrant because he "simply believed there was no rush." *Mitchell*, 565 F.3d at 1353 (finding 21-day delay unreasonable under the circumstances "because law enforcement officers simply believed there was no rush").  To the contrary, Watson testified that during the delay period he was engaged in ten overlapping drug investigations, he suffered an illness which caused him to be absent from work, and he obtained the search warrant on the first day back at work after being out sick.  Thus, the evidence supports a finding that Watson diligently pursued his investigation.  There is no evidence in the record disproving Watson's diligence in obtaining the warrant.

Balancing the relevant factors together and considering the totality of the circumstances, the undersigned finds that the delay of twenty-three days is not unreasonable.  *See United States v. Bragg*, 44 F.4th 1067, 1073 (8th Cir. 2022) (finding 24-day delay in obtaining search warrant for iPhone).  Although a twenty-three-day delay in obtaining a search warrant for cell phones seized by law enforcement is not ideal, the

undersigned is persuaded by the Seventh Circuit that "police imperfection is not enough to warrant reversal . . . [where the] delay was not the result of completed abdication of [an officer's] work or failure to see any urgency." *United States v. Burgard*, 675 F.3d 1029, 1034 (7th Cir.) (quotations omitted), *cert. denied*, 568 U.S. 852 (2012). The balance of interests weighs in favor of the Government.

Next, the Government presented testimony from Tynan explaining that its delay in obtaining a federal search warrant for the iPhone was due to not having the technology or capability to access the device. (Doc. No. 53, Tr. at 100.) The federal search warrant was obtained less than ten months after the state search warrant was obtained, and 321 days after the seizure of the iPhone. According to Tynan, he waited ten months to obtain the federal search warrant because he was "working a lot of cases[,]" "waiting on the chemistry for the case [and] was talking with the U.S. Attorney's Office [about whether . . . to even pursue getting an additional warrant]"; and "hadn't been confident that somebody else could certainly get into [the iPhone]." (*Id*. at 146, 147.) However, once Tynan believed that law enforcement may have new technology to access the content of the iPhone, he obtained the warrant. (*Id*. at 100.)

In *Herring v. United States*, the United States Supreme Court "accept[ed] the parties' assumption that there was a Fourth Amendment violation" but ultimately affirmed the Eleventh Circuit's denial of the defendant's motion to suppress, explaining that "[t]he fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies." *Herring*, 555 U.S. 135, 149-140 (2009). Indeed, "[e]xclusion of evidence is an 'extreme sanction' to be used only as a 'last resort.' " *United States v.*

*Brooks*, 648 F. App'x 791, 794 (11th Cir. 2016) (quoting *Herring*, 555 U.S. at 140).[46]  "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."  *Id*. (quoting *Herring*, 555 U.S. at 144).  "[T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct."  *Id*. (quoting *Herring*, 555 U.S. at 144).  *See Herring*, 555 U.S. at 140-41 ("We have never suggested that the exclusionary rule must apply in every circumstances in which it might provide marginal deterrence.") (citation and internal quotations omitted).  "Isolated negligence attenuated from the arrest" does not justify suppression.  *Herring*, 555 U.S. at 136.

Here, even if the Government's delay constituted a Fourth Amendment violation – which the undersigned need not decide –"the facts of this case do not rise to the level necessary to justify the 'extreme sanction' of exclusion."  *Brooks*, 648 F. App'x at 794.  There is no evidence that Tynan acted in a deliberate, reckless, or grossly negligent manner in obtaining a federal search warrant almost one year after seizing Roberts' iPhone.  It is worth repeating that the iPhone already was in government custody pursuant to a lawful seizure *before* Watson obtained the state search warrant and remained in government

---

[46] In *Brooks*, the Eleventh Circuit addressed a request for suppression based on the government's failure to return property that was seized pursuant to a warrant and fell outside the scope of the investigation.  *Id*. at 793–94.  The Circuit affirmed the denial of the defendant's motion to suppress because the defendant failed to demonstrate that the government engaged in deliberate, reckless, or grossly negligent conduct in failing to return the property in a timely manner.  *Id*. at 794.  Thus, the Court concluded that the circumstances did not "rise to the level necessary to justify the 'extreme sanction' of exclusion."  *Id*.

custody pursuant to the lawful state search warrant *before* Tynan obtained the federal search warrant.  After the state search warrant was obtained, law enforcement attempted to search the contents of the iPhone but was unsuccessful.  Although the Government's delay in obtaining the federal search warrant for the iPhone was certainly prolonged, it does not furnish a basis to suppress evidence obtained from the iPhone.  *See United States v. Estime*, 19-cr-711 (NSR), 2020 WL 6075554, at *25 (S.D.N.Y. Oct. 14, 2020) (finding the government's ongoing delay in reviewing the electronically stored information in defendant's cell phone was not unreasonable even though 10 months had already passed); *United States v. Carlisle*, Case No. 5:16-cr-0024-MHH-HGD, 2017 WL 2021090, at 7 (N.D. Ala. 2017) (finding 441-day delay by law enforcement in performing forensic analysis on computer's hard drive did not warrant exclusion of the evidence).  Therefore, application of the exclusionary rule would "provide marginal deterrence" with respect to law enforcement.  *Herring*, 555 U.S. at 141.

Moreover, the undersigned reiterates that the record is devoid of any indication that Roberts ever requested or sought return of his cell phones.  *See United States v. Morgan*, 713 F. App'x 829, 831 (11th Cir. 2017) (noting, where the defendant argued that the government interfered with his possessory interest in his cell phone by seizing the cell phone prior to obtaining a warrant, that the defendant's interest in the cell phone was diminished because there was no evidence that the defendant ever asked for the cell phone to be returned); *see also Johns*, 469 U.S. at 487 (reasoning that the respondents failed to demonstrate that the government's conduct relating to the search of the respondents' property adversely affected their possessory interests protected by the Fourth Amendment

where, *inter alia*, the respondents never asked for the property to be returned); *Burgard*, 675 F.3d at 1033 ("[I]t can be revealing to see whether the person from whom the item was taken ever asserted a possessory claim to it – perhaps by checking on the status of the seizure or looking for assurances that the item would be returned.  If so, this would be some evidence (helpful, though not essential) that the seizure in fact affected [his] possessory interests."); *Stabile*, 633 F.3d at 235 (concluding three-month delay in obtaining warrant, caused by the lead agent's assignment on a protective Secret Service detail, was reasonable where the defendant did not request return of his hard drive until 18 months after the initial seizure).

Given that there is no evidence in the record showing that the Government unlawfully interfered with Roberts' possessory interest in his property through deliberate, reckless, or grossly negligent conduct, the undersigned concludes that the extreme remedy of suppression is not justified.

Having considered Roberts' challenges to the delay in obtaining the state and federal search warrants, the undersigned concludes that the motion to suppress is due to be denied on these issues.

## IV.   CONCLUSION

For the reasons stated above, it is the RECOMMENDATION of the Magistrate Judge that Defendant's motion to suppress (Doc. No. 27) be DENIED.  It is further

ORDERED that the parties shall file any objections to the said Recommendation not later than June 1, 2023.  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting.  Frivolous,

conclusive or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file a written objection to the Magistrate Judge's findings and 28 U.S.C. § 636(b)(1) shall bar a *de novo* determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of a party to challenge on appeal the District Court's order based on unobjected-to-factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  11th Cir. R. 3-1; *Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE this 18th day of May, 2023.

JERUSHA T. ADAMS
UNITED STATES MAGISTRATE JUDGE